UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **DONALD SADLER, ET AL.** | **CIVIL ACTION NO. 09-1254** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **INTERNATIONAL PAPER CO.** | **MAG. JUDGE MARK L. HORNSBY** |

**RULING**

Pending before the Court is Defendant International Paper Co.'s ("IP") "Motion to Exclude the Report, Opinions, and Testimony of James N. Tarr, P.E." [Doc. No. 135]. Plaintiffs filed a memorandum in opposition to the motion. [Doc. No. 171]. IP filed a reply. [Doc. No. 186].

For the following reasons, IP's motion is GRANTED IN PART and DENIED IN PART.

**I.     Procedural Background**

On July 28, 2009, Plaintiffs brought suit against IP, which formerly operated a paper mill in Bastrop, Louisiana, for claims based on IP's alleged release of hazardous substances into the air, asserting that the release caused or exacerbated their health conditions.

In support of their claims, Plaintiffs retained James N. Tarr ("Tarr"), a chemical engineer, to provide an expert opinion.

On September 9, 2013, IP filed seven motions *in limine* [Doc. Nos. 135-141], which are currently pending and which seek to exclude all Plaintiffs' experts.

On December 2, 2013, Plaintiffs filed their memoranda in opposition to the pending motions in limine. *See* [Doc. Nos. 167-173].

On December 30, 2013, IP filed reply memoranda [Doc. Nos. 186-192].

**II.     Law and Analysis**

Under Federal Rule of Evidence 702, an expert opinion on scientific, technical, or specialized knowledge can be admitted only if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. Under Rule 702, a district court has considerable discretion in deciding whether to admit or exclude expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-9 (1997) (reviewing district court's determination under abuse of discretion standard).

Reliability and relevance, under Rule 702, are the hallmarks of admissible testimony from an expert witness. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993); *In re MBS Mgmt. Servs., Inc.*, 690 F.3d 352, 357 (5th Cir. 2012) ("[T]he trial judge serves as a gatekeeper to ensure the reliability and relevance of expert testimony."). Relevance includes not only the general requirement contained in Rule 401 that the testimony tend to make the existence of any fact more probable or less probable, but also the prerequisite that the expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702; *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (quoting 3 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 702[02], p. 702-18 (1988)). In determining reliability, "the trial court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that

reasoning or methodology can properly be applied to the facts in issue." 509 U.S. at 589. "The district court's responsibility is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) (quoting *Kumho*, 526 U.S. at 152)).

"[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility. . . . " *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (internal quotations and citations omitted). "It is the role of the adversarial system, not the court, to highlight weak evidence[.]" *Primrose Operating Co. v. Nat'l American Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

Plaintiffs' expert, Tarr, has been an engineer for almost forty years, is licensed in Texas, and specializes in chemical engineering and environmental impacts. IP does not attack Tar's qualifications as an expert in his given field. Instead, IP attacks the foundation of his opinions. IP moves to exclude Tarr's report, opinions, and testimony on the following bases: (1) Tarr's opinion that emissions produced negative health impacts is not based on any scientific assessment of exposure of impact, (2) Tarr's fuel use opinion is based on unsound methodology and a series of unsubstantiated assumptions, (3) Tarr's odor opinion is based on unfounded assumptions and conjecture, and (4) Tarr's opinion that IP failed to "live up to a 'special responsibility' to protect the public from air exposure" is not based on any authority, standards, or support.

### A.  Tarr's Opinion that Emissions Produced Negative Health Impacts

IP argues, first, that Tarr's testimony and report that its emissions produced negative health impacts should be excluded because Tarr does not rely on any scientific assessment of exposure of impact. Specifically, Tarr did not conduct air dispersion modeling, nor make any other attempt to scientifically estimate or quantify ambient air concentrations of compounds emitted by IP's Louisiana mill at any of Plaintiffs' locations.

Plaintiffs respond, however, Tarr is not a medical expert and is not offering an opinion as to health impacts caused by emissions or to personal injuries suffered by any Plaintiff. [Doc. No. 171, p. 6 and Exh. 2, Tarr Deposition, p. 102:5-8, 13-18]. Tarr's opinions relate to the types of fuels used at the mill and the impact of those fuels on the mill's air admissions.

In its reply memorandum, IP responds that Tarr opined that emissions from the Louisiana mill produced "negative health impact[s]" in the Bastrop community. [Doc. No. 151, Exh. 10, Tarr Report at 6]. Thus, while Plaintiffs may contend that Tarr is not offering an opinion as to their personal injuries, IP contends that they refer to his opinions as related to the "negative health impacts to the community as a whole." [Doc. No. 186, p. 3 quoting Doc. No. 171, p. 4 ("Mr. Tarr's opinions that Defendant chose to operate in a manner that . . . increas[ed] the emissions and resulting negative health impacts on those in the surrounding community will certainly help the trier of fact . . . .")].

Having considered the arguments and Tarr's field of expertise, the Court finds that Tarr is not qualified to, nor did he provide an appropriate basis to, render an opinion on "negative health impact[s]." To this extent, IP's Motion in Limine is GRANTED.

### B.  Tarr's Fuel Use Opinion

Next, IP argues that Tarr should be precluded from opining that IP's decision "to use a variety of 'mixed' fuels in place of natural gas in several Bastrop Mill combustion systems . . . saved

a great deal of money, and increased the negative health impact of toxic chemical air pollution in the surrounding community." [Doc. No. 135, p. 7]. IP again argues that Tarr cannot opine on the "negative health impact." IP also argues that Tarr should be barred from offering opinions on the use of mixed fuels instead of natural gas because his opinion is based on unsound methodology and a series of unsubstantiated assumptions.

For the reasons previously stated, the Court agrees with IP that Tarr cannot testify about "negative health impact," and, to this extent, IP's Motion in Limine is GRANTED.

The Court must also consider, however, whether Tarr can testify consistently with the remainder of his fuel use opinion that the use of mixed fuels saved IP a "great deal of money" and increased "toxic chemical air pollution in the surrounding community." [Doc. No. 135, Exh. 10, Tarr Report, p. 6]. IP moves to exclude this portion of Tarr's fuel use opinion for several reasons.

First, IP attacks Tarr's method of adding together the permitted emissions levels of $SO_2$, $No_x$, $PM_{10}$, and total VOCs for each combustion source to obtain an aggregated "total toxic chemical air emissions" and then comparing the effects of using this so-called mixed fuel to the effects of using natural gas.

Second, even assuming this comparison were scientifically acceptable, IP challenges Tarr's fuel use opinion because he erroneously derived numbers from a June 28, 2000 Emissions Inventory Questionnaire when his stated period of study was from January 1, 2003, to the closure of the mill in 2008, and he rounded the numbers he obtained from IP's Title V Permit Application and "altered the summed emissions from two of the emissions sources."

Third, IP moves to exclude Tarr's fuel use opinion because he relies on "unsubstantiated assumptions that are contradicted by facts" [Doc. No. 135, p. 10]. IP explains that Tarr relied on permitted, rather than actual, emissions and this reliance resulted in and affected his making of a

number of improper assumptions: (1) the assumption that IP's Bastrop mill burned fuels at the maximum permitted amounts throughout its operation; (2) the assumption that an unverified document supported his view of the mixed fuel use in the No. 3 Power Boiler (which he characterized as the largest emissions source); (3) the assumption that the combination of fuels burned by the No. 3 Power Boiler corresponded to the fuel mixture scenarios used in defining its permitted emissions levels during the permitting process; (4) the assumption that the No. 3 Power Boiler burned fuels at the maximum emissions rate.

Fourth, IP contends that Tarr's fuel use opinion should be excluded because it depends on his assertion that IP saved $44,200,000 per year by using mixed fuel instead of natural gas in the No. 3 Power Boiler. Tarr's savings determination is also based on his allegedly faulty use of permitted emissions data, his incorrect assumption that IP was allowed to operate the No. 3 Power Boiler on 100% tire-derived fuel ("TDF"), and his determination of price information from third-party sources, rather than IP.

Plaintiffs respond in their opposition memorandum that Tarr properly employed sound engineering methodology in his report. At the outset, the Court notes that a number of Plaintiffs' arguments are based on a supplemental affidavit from Tarr, which the Court has since stricken. *See* [Doc. Nos. 195 and 196]. Nevertheless, to the extent the arguments may be based on Tarr's report and deposition, the Court has considered those arguments.

First, Plaintiffs argue that Tarr properly employed the standard methodology of chemical engineers:

(1)  designate the facility of interest;

(2)  choose the area around the facility of interest in which impact of toxic chemical air emissions is to be evaluated;

6

  (3)  conduct an engineering analysis of the manufacturing processes, the waste disposal practices, and the raw material and product handling procedures at the facility of interest;

  (4)  identify each toxic chemical air emission source associated with the facility;

  (5)  measure, calculate, estimate, or otherwise ascertain the air emission rate of all toxic chemicals emitted from each source identified in the above step.

[Doc. No. 171, pp. 5-6]. Plaintiffs point out that the methodology was particularly appropriate because the mill had been shut down prior to Tarr's retention and was in the process of being demolished. Although Tarr admits that he used permitted emissions rates of the five largest emissions sources, rather than actual emissions, he testified that this information was "adequate" for his purposes. [Doc. No. 171, p. 10, Exh. 2, Tarr Deposition, p. 113:20-25]. In his comparisons, Tarr used permitted emissions rates for both calculations (mixed fuels versus natural gas).

  Plaintiffs also respond specifically to a number of IP's arguments. Many of these arguments have not been considered by the Court because they are based solely on Tarr's stricken affidavit. However, Plaintiffs do point out that IP complains disingenuously about Tarr's reliance on a consultant-prepared flow process document because IP does not deny that the document provided accurate information about the No. 3 Power Boiler and the fuels used in it, only that the document failed to list fuels that were "actually used." [Doc. No. 171, p. 12 (quoting Doc. No. 135, p. 13)]. Plaintiffs also respond that Tarr properly used price values that were consistent across his calculations (i.e. even if his figures were high, they were high for both mixed fuels and for natural gas), and, even if different prices were used, his opinion would be the same: natural gas was a cleaner-burning, but more expensive fuel.

  In its Reply, IP responds, first, that, as noted, the Court should not rely on Tarr's affidavit. Additionally, IP points out that Plaintiffs have not offered any response as to why aggregated

emissions of multiple substances should be considered a credible methodology. (IP continues to contend that it is **not** an acceptable methodology). IP further argues that, while Tarr admits that he relied on permitted emissions, his report does not make clear that he was not using actual emissions. IP again argues that Tarr relies on assumptions that are contradicted by the facts: (1) contrary to his belief that actual and permitted emissions were about the same, actual emissions were lower than permitted emissions; (2) by using permitted emissions, Tarr has overstated the costs savings; and (3) the same materials available to Tarr were sufficient for IP's expert to determine the actual fuel use in the No. 3 Power Boiler, contrary to Tarr's explanation for using 100% TDF when the boiler never burned 100% TDF.

Having considered the arguments and evidence, the Court finds that Plaintiffs will be permitted to offer Tarr's testimony and evidence about fuel use. He is a qualified expert in chemical engineering who has applied standard scientific methodology which may assist the jury in determining issues of fact on Plaintiffs' remaining claims. Specifically, the Court finds that it will assist the jury to hear Tarr's testimony about IP's ability to use natural gas, instead of other fuels, and the resultant effects. While IP has pointed out the weaknesses in Tarr's opinion, IP can do the same during cross-examination of Tarr. Thus, this portion of IP's Motion in Limine is DENIED.

### C. Tarr's Odor Opinion

IP also moves to exclude Tarr's statements regarding the odor of total reduced sulfur ("TRS") air emissions from the IP mill. IP contends that Tarr did not rely on any scientific evidence to support his odor opinion, made no assessment of odor, made no assessment of the presence of TRS compounds surrounding the IP mill, and the opinion is based on permitted, not actual, TRS emissions. IP further contends that Tarr's opinion that TRS air emissions could have been reduced is based on conjecture, unverified schematics, and lack of operational knowledge.

In their opposition, Plaintiffs respond that Tarr's odor opinion is relevant to their private nuisance claim because IP chose not to incinerate waste gas containing TRS as a cost-saving mechanism, and this decision increased the odor problem in the surrounding community. Plaintiffs argue that Tarr's essential opinion is that IP could have introduced technology to reduce its odor impact on the surrounding community, but chose not to do so. According to Plaintiffs, Tarr reasonably relied on documents applicable generally to the kraft pulp mills.

In its reply, IP reiterates its previous arguments, pointing out that Plaintiffs do not contest those arguments regarding the lack of evidence and failure to apply any scientific methodology. IP again argues that Tarr's reliance on permitted emissions lacks scientific rigor. Finally, IP denies that Tarr can rely on "engineering judgment" to recommend technology without evidence that such technology is suitable for use in the mill or should have the desired effect of reducing TRS emissions. For example, IP notes that Tarr recommended installation of a regenerative thermal oxidizer, but admitted at his deposition that this technology was already in place and that it would have already reduced TRS emissions.

Having considered the arguments and evidence, the Court finds that Plaintiffs will be permitted to offer Tarr's testimony and evidence regarding the odor caused by TRS emissions. It is an undeniable fact that there is an odor associated with paper production. As a chemical engineer who relied on sources about technology currently available in the paper production industry, Tarr can reasonably and reliably testify about technology which has been shown to reduce or further reduce TRS emissions and the resulting odor. IP's Motion in Limine is DENIED to this extent.

**D.**     **Tarr's Opinion on IP's Special Responsibility**

Finally, IP moves to exclude Tarr's statement that "[g]iven that the mill was surrounded by nearby neighborhoods, [IP] has a special responsibility to protect the public from air exposure by

implementing efficient abatement systems," and IP "failed to live up to their [sic] special responsibility." [Doc. No. 135, Exh. 10, Tarr Report, p. 6]. IP points out that Tarr relies on only two general sources–a chart from the 1995 edition of the Sector Notebook Project, Pulp and Paper Industry, published by the United States Environmental Protection Agency ("EPA"), which states that the pulp and paper industry accounts for 17% of "all toxic chemical air emissions," and a 1959 magazine article from a chemical engineering periodical, which he admits does not directly support his opinion. Citing *Carrier v. City of Amite*, 50 So.2d 1247 (La. 2010) (per curiam), IP contends that Tarr's opinion is insufficient to support the imposition of a special responsibility on IP.

In their opposition, Plaintiffs argue that, under *Carrier*, an expert opinion alone is insufficient to create a special responsibility, but the expert can establish a special responsibility or duty if he cites authority for his opinion. In this case, Plaintiffs contend that Tarr's opinion that IP owed a special responsibility arises from the ethical obligations imposed on all engineers and cites Title 46 of the Louisiana Administrative Code, Section 2503(a), which provides that "[l]icensees shall hold paramount the safety, health, property and welfare of the public in the performance of their professional responsibilities." [Doc. No. 171, p. 19].

IP replies that Tarr offered no authority or standard to support his special responsibility opinion, either in his report or his deposition. IP points out that Tarr now concedes the EPA notebook he relied on was outdated, and he admittedly had no knowledge of the "underpinnings" of the 1959 article. [Doc. No. 186, p. 9 n.6]. Since these were the only "authorities" to support his opinion, IP contends that Plaintiffs cannot "shore up" Tarr's opinion with a new affidavit and citation to an authority upon which he did not rely at the time he issued his report. Finally, even if this Court were to consider the "new" authorities that Tarr now relies on, IP argues that the only connection between an engineer's ethical duties and this case is Tarr's "bare assertion that '[t]he

Bastrop mill was designed, built, and operated by engineers [who] in the course of their work . . . should have considered what they needed to do in order to make the mill safer and less of an odor nuisance with regard to the surrounding community.'" [Doc. No. 185, p. 10 (quoting Doc. No. 171, Tarr. Aff., ¶ 38)].

It is clear and undisputed that a party's responsibility or duty to others is not a function of an expert's opinion, but of some type of governing standard, whether legal, scientific, technical, etc. *See Carrier*, 50 So.2d at 1249-50 ("[W]e must conclude [the expert's] testimony reflects his own personal opinion as to what a retailer should do, and is not based on any objective standards establishing what a retailer is required to do."). However, Tarr's basis for his special responsibility was not based on any standards, only an outdated notebook and an old article. On this basis alone, the Court finds that IP's Motion in Limine should be granted to this extent. Nevertheless, even if the Court considered Plaintiffs' new argument, based on Tarr's stricken affidavit, the connection between the ethical obligations of engineers and a paper mill's duties to the community is too tenuous to create the special responsibility or duty Plaintiffs assert. Under these circumstances, the Court finds that Tarr's opinion that IP owed a "special responsibility" is not relevant. To this extent, IP's Motion in Limine is GRANTED.

### III. Conclusion

For the foregoing reasons, IP's Motion in Limine [Doc. No. 135] is GRANTED IN PART and DENIED IN PART. To the extent that IP has moved to exclude Tarr's testimony, report, or other evidence relating to "negative health impact[s]" on the community and the special responsibility owed by IP, the motion is GRANTED. The motion is otherwise DENIED.

MONROE, LOUISIANA, this 28th day of April, 2014.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE