UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **DONALD SADLER, ET AL.** | **CIVIL ACTION NO. 09-1254** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **INTERNATIONAL PAPER CO.** | **MAG. JUDGE MARK L. HORNSBY** |

**RULING**

Pending before the Court is Defendant International Paper Co.'s ("IP") "Motion to Exclude the Report, Opinions, and Testimony of Mr. William A. Williams" [Doc. No. 137]. Plaintiffs filed a memorandum in opposition to the motion. [Doc. No. 173]. IP filed a reply. [Doc. No. 188].

For the following reasons, IP's motion is GRANTED.

**I.   Procedural Background and Contested Opinion**

On July 28, 2009, Plaintiffs brought suit against IP, which formerly operated a paper mill in Bastrop, Louisiana ("the mill"), asserting that IP's alleged release of hazardous substances into the air caused or exacerbated certain of their health conditions. Plaintiffs, who all lived, worked, and/or resided near the mill prior to its closure in 2008, have pending claims of negligence and private nuisance against IP.[1]

In support of their claims, Plaintiffs retained Mr. William A. Williams ("Williams") to prepare an air dispersion model. Williams took some college courses towards a mechanical engineering degree, but did not finish. He began working in the automotive services field in 1983.

---

[1] Plaintiffs originally brought claims of trespass, public nuisance, and for property damages, but on March 14, 2014, the Court granted IP's Motion for Summary Judgment and dismissed these claims. [Doc. No. 198].

In 1996, he opened his own business, WISAT,[2] developing training software and videos for the automotive undercar services industry.[3] Williams later became associated with Edward Bell, Plaintiffs' counsel, and relocated to Georgetown, South Carolina, to work with him on products liability cases. Prior to his involvement in this case, Williams had no experience with air dispersion modeling.

After having been asked to prepare an air dispersion modeling study, Williams studied the software and prepared two models. On February 28, 2013, Williams issued his report, explaining as follows:

> The purpose of this study was to quantify the concentrations for each of the chemicals of concern (COCs) generated by the Bastrop IP Mill that were present in the surrounding community and specifically the "test plaintiffs" exposure points from 1975 to 2007. The COCs include but are not limited to oxides of sulfur ($So_x$), oxides of nitrogen ($No_x$), particulate matter less than 10 microns (PM10), total volatile organic compounds (VOCs), and specific VOCs such as acrolein, formaldehyde, and acetyladehyde. The purpose of this report is to discuss the methodology used in performing the air modeling study. The results of the study and their impact on the community and test plaintiffs are to be discussed by other experts retained in this matter.

[Doc. No. 151, Exh. 12, p. 1]. He then opined:

> It is my opinion that the modeling as presented in this report accurately reflects the parameters involved with the Bastrop IP Mill and the methodology used has resulted in accurate estimations of COC emissions. I base this on the following:
>
> 1. All of the model input data except the additional meteorological data purchased from Trinity Consultants was obtained directly from previous modeling work performed by URS or discovery produced by [IP].

---

[2]WISAT is an acronym for Williams' Innovative Software and Training.

[3]According to Williams, the undercar industry includes "exhaust systems, steering suspension, alignment, brakes, and some minor under-hood service." [Doc. No. 151, Exh. 25, p. 6:6-7].

    2.    Model input data was checked and cross referenced where possible with multiple sources to prevent inaccurate input data.

    3.    The modeling process was validated early on in comparing to results obtained by URS during their Title V work performed in 2008.

    4.    The emission inputs used were those reported to the LDEQ.

    5.    Meteorological data used for Model Set #1 was the same data used by URS in their Title V project.

    6.    All additional meteorological data was obtained by Trinity Consultants[,] a leader in environmental software and data service[.]

    7.    The work was periodically checked by Dr. Clark for accuracy.

[Doc. No. 151, Exh. 12, p. 15; Doc. No. Exh. 1, p. 15].

On September 9, 2013, IP filed seven motions *in limine* [Doc. Nos. 135-141], seeking to exclude Plaintiffs' experts.

On December 2, 2013, Plaintiffs filed their memoranda in opposition to the pending motions in limine. *See* [Doc. Nos. 167-173]. On the same date, Plaintiffs filed a Motion to Hold Hearing on Defendant's Expert Witness Exclusion Motions and a Motion to Modify Case Management Order ("Motion to Hold Hearing and Modify CMO") [Doc. No. 176].

On December 27, 2013, IP filed an opposition to Plaintiff's Motion to Hold Hearing and Modify CMO [Doc. No. 183]. On December 30, 2013, IP filed reply memoranda in support of its motions in limine [Doc. Nos. 186-192], as well as a Motion to Strike Plaintiffs' Expert Affidavits and Supplemental Reports ("Motion to Strike") [Doc. No. 184].

On January 20, 2014, Plaintiffs filed a memorandum in opposition to IP's Motion to Strike [Doc. No. 194].

In support of their Motion to Hold Hearing and Modify CMO, Plaintiffs explained that they

timely served IP with discovery requests, and IP responded by producing 54,139 files and over 1,000,000 pages without providing the data on actual emissions that Plaintiffs needed or any direction as to where this data could be found. After reviewing the files, Plaintiffs found a number of references to electronic/native modeling files which were not produced. When asked, IP directed them to a third party contractor, URS Corporation ("URS"), which had provided air permitting services to IP, and Plaintiffs then directed a subpoena to URS. In the meantime, Williams created an air dispersion model using limited air modeling data from the Louisiana Department of Environmental Quality ("LDEQ") and the point source permit information IP had supplied for years 1975-2007, as well as meteorological data from Shreveport. Williams provided the model to Plaintiffs' environmental expert, Dr. James Clark,[4] and, after his review, Williams prepared a second model using meteorological data from Monroe because it is closer to Bastrop.

After Plaintiffs received data from URS, Williams prepared a third model (Model #3), allegedly based on actual emissions, which covered years 2004 and 2005. The Model #3 emissions numbers are actually lower than those in Model #2. On May 3, 2013, Dr. Clark issued another report relying on the Model #3 figures.

However, after considering the arguments of the parties, on January 30, 2014, the Court issued a Ruling [Doc. No. 195] and Judgment [Doc. No. 196], denying Plaintiffs' Motion to Hold Hearing and Modify CMO and granting IP's Motion to Strike. The Court ruled as follows:

> In this case, it is clear that Plaintiffs have failed to comply with Rule 26 and the CMO. According to Plaintiffs' own arguments, they knowingly submitted an expert report from Dr. Clark that was based on permitted emissions, rather than the actual

---

[4]Plaintiffs retained Dr. Clark, who has a doctorate in environmental health sciences, to provide an expert opinion, "quantifying the exposures to hazardous and toxic air pollutants that plaintiffs received from the former [IP] . . . plant." [Doc. No. 151, Exh. 6, p. 1].

emissions of the Bastrop mill. Plaintiffs' expert, Mr. Williams, was already working on another model at the time that Dr. Clark submitted his first expert report, yet Plaintiffs failed to take any reasonable action to alert IP or this Court to their alleged need for additional time to review and analyze discovery. Plaintiffs compounded their knowing submission of an incomplete and/or inaccurate expert report because their other experts relied on Dr. Clark's February 28, 2013 opinion.

> Further, Plaintiffs failed to notify IP or this Court of any issue with its expert reports until May, 2013, three months later, when they provided IP with Dr. Clark's second report without Court approval. At that point, IP had already deposed some of Plaintiffs' experts and were to depose Dr. Clark within a few days. When IP raised its objections to Dr. Clark's so-called supplemental report, Plaintiffs' counsel indicated that they would present the issue to the Court, but, inexplicably, they did not. Instead, Plaintiffs went on to give IP a second report from Dr. Irby in June, 2013, four months after the deadline. Plaintiffs only presented this Court with affidavits from all their experts and filed the instant motion on December 2, 2013, nine months after the Rule 26 expert disclosures were due, after IP had filed motions *in limine* to exclude Plaintiffs' expert reports, and after Plaintiffs received an extension of time to respond to the pending motions in limine.

> Even if the Court found that IP failed to comply with its discovery obligations (which it does not), Plaintiffs ignored their own obligations under Rule 26 and the CMO. Plaintiffs had more than one option: they could have moved for an extension of the expert disclosure deadline, they could have filed a motion to compel or raised objections to the Court of IP's alleged failure to comply with reasonable discovery requests, or they could have notified IP at the time the first report was provided that they were in the process of preparing a second report using discovery from URS. . . Plaintiffs took none of these actions. As a result, IP's experts and attorneys prepared for depositions based on the initial reports, IP's attorneys took depositions of Plaintiffs' experts based on the initial reports, and IP reasonably filed extensive motions in limine.

> . . .

> Finally, with regard to the affidavits filed on December 2, 2013, Plaintiffs have not offered an explanation to justify its filing of extensive affidavits nine months after the expert disclosures deadline. The Court has previously considered affidavits from experts in other cases which sought to respond to issues raised in a motion filed by an opposing party. However, the affidavits in this case do not seek merely to clarify the opinions of Plaintiffs' experts, but are extensive supplementation, elaboration, and revision of the opinions expressed in their reports.

[Doc. No. 195, pp. 11-13].

5

As a result of the Court's Ruling, the supplemental reports of Drs. Clark and Irby and the affidavits of all Plaintiffs' experts filed on December 2, 2013, were stricken from the record. Among the documents stricken from the record were Williams' affidavit and his untimely prepared Model #3 using IP's actual emissions, rather than its permitted emissions.

On March 24, 2014, the Court issued a Ruling and Judgment [Doc. Nos. 199 & 200] granting in part and denying in part IP's "Motion for Summary Judgment and Partial Summary Judgment on Certain Test Plaintiffs' Claims." The Court granted the motion as to all claims by Plaintiffs Jaunice Gorman, Roberta Anne Lambert, Emma Odom, and Robin Payton, and their claims were dismissed with prejudice. The Court granted the motion in part on Plaintiffs' personal injury claims for conditions other than asthma, chronic bronchitis, COPD, coughing, and sinusitis, limiting Plaintiffs to recovery for asthma, chronic bronchitis, COPD, coughing, sinusitis, and related symptoms. The Court also granted the motion for partial summary judgment in part on certain identified claims by certain Plaintiffs, dismissing the claim by Plaintiff Jamieon Akins that his sinus infections were caused by the mill emissions, but preserving claims by other Plaintiffs. Finally, the Court granted IP's motion in part on damages, dismissing Plaintiffs' claims for general damages, future medical expenses, and lost wages, but denying the motion as to past medical expenses.

On April 28, 2014, the Court issued a Ruling and Order [Doc. Nos. 201 & 202] granting in part and denying in part IP's Motion to Exclude the Report, Opinions, and Testimony of James N. Tarr, P.E. ("Tarr"). The Court granted the motion to exclude Tarr from rendering an opinion on "negative health impact[s]" and any special responsibility owed by IP. The motion was otherwise denied, and Tarr will be permitted to offer opinion testimony at trial on fuel use and odor caused by

IP's emissions.

On September 19, 2014, the Court issued a Ruling and Order [Doc. Nos. 203 & 204] denying IP's Motion to Exclude the Report, Opinions, and Testimony of Dr. Allan R. Goldstein.

The Court now turns to the instant motion. As an initial matter, the Court notes that a number of Plaintiffs' arguments in its opposition memoranda to the pending motions in limine are based on stricken supplemental affidavits and reports. The Court has considered only those arguments currently supported by record documents.

## II. Law and Analysis

Under Federal Rule of Evidence 702, an expert opinion on scientific, technical, or specialized knowledge can be admitted only if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. Under Rule 702, a district court has considerable discretion in deciding whether to admit or exclude expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-9 (1997) (reviewing district court's determination under abuse of discretion standard).

"[T]he proponent of expert testimony must establish the witness's qualifications by a preponderance of proof." *United States v. Griffith*, 118 F.3d 318, 322 (5th Cir. 1997) (citation omitted). "To qualify as an expert, 'the witness must have such knowledge or experience in [his]

7

field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'" *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992) (second alteration in original) (quoting *United States v. Johnson*, 575 F.2d 1347, 1361 (5th Cir. 1978)).

If the proponent establishes that an expert witness is otherwise "qualified" under Rule 702, the trial court is charged with determining whether his testimony is reliable and relevant. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993); *In re MBS Mgmt. Servs., Inc.*, 690 F.3d 352, 357 (5th Cir. 2012) ("[T]he trial judge serves as a gatekeeper to ensure the reliability and relevance of expert testimony."). Relevance includes not only the general requirement contained in Rule 401 that the testimony tend to make the existence of any fact more probable or less probable, but also the prerequisite that the expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702; *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (quoting 3 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 702[02], p. 702-18 (1988)). In determining reliability, "the trial court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can properly be applied to the facts in issue." 509 U.S. at 589. "The district court's responsibility is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) (quoting *Kumho*, 526 U.S. at 152)). However, the focus of reliability "must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595.

"[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect

the weight to be assigned that opinion rather than its admissibility. . . . " *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (internal quotations and citations omitted). Thus, "[i]t is the role of the adversarial system, not the court, to highlight weak evidence[.]" *Primrose Operating Co. v. Nat'l American Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

Plaintiffs retained Williams to prepare an air dispersion model. IP attacks Williams' opinions on three grounds: (1) Williams lacks the qualifications as an expert in air dispersion modeling, (2) Williams did not apply appropriate methodology in a reliable or scientifically valid way, and (3) Williams' air dispersion modeling work is not relevant to assist the trier of fact.

### A.     William's Qualifications

IP first argues that Williams lacks the qualifications to serve as an expert in air dispersion modeling, which are derived from physical and chemical principles and are highly technical. He does not have any education or a degree in air dispersion modeling, chemistry, chemical engineering, meteorology, or chemical fate and transport; he has not published papers or articles in this area; he has never made a presentation in these areas; he does not have any professional memberships, affiliations, or awards in these areas; and he has never been qualified as an expert in air dispersion modeling. Williams' work experience is almost exclusively in the automotive services industry. Although he has been an expert twenty times, sixteen of those times were for matters related to Ford vehicles, and the remaining four times had no connection to air dispersion modeling. Until 2012 when Williams became aware that he would be offered as an expert in this case, he had no experience with air dispersion modeling and had never even used any air dispersion modeling

software. IP argues that Williams did nothing more than choose the AERMOD as an air dispersion modeling software program and input data for which he had to rely heavily on others because of his own lack of knowledge and experience.

Plaintiffs admit that IP's recitation of Williams' background is correct. Plaintiffs argue, however, that Williams need not have any formal training to be qualified as an expert, but may be qualified by knowledge or skill alone. To this end, Plaintiffs contend that IP has ignored Williams' "extensive experience with computer software since the early '80s including software programming in multiple languages and extensive use of other computer modeling programs." [Doc. No. 173, p. 10]. Plaintiffs argue that Williams' foundation allowed him to "teach himself how to implement the air modeling software" he used to build three models.[5] Although Plaintiffs admit that Williams "may not be the most qualified person in the world to build air models," they argue he meets "the minimum specialized knowledge standards." *Id.* at pp. 9-10.

The Court finds that Williams is not qualified by knowledge, skill, experience, training, or education to offer an expert opinion on air dispersion modeling. Although Rule 702 and the case law interpreting it are clear that he need not have a specialized degree, Williams simply had no special knowledge, skill, experience, training, or education--in the classroom or outside of it--of his air dispersion prior to his use of the air dispersion modeling software. The Court does not discount Williams' experience with computer software and has considered the authority cited by Plaintiffs, *Wellogix, Inc., v. Accenture, L.L.P.*, 716 F.3d 867 (5th Cir. 2013), but finds that case distinguishable.

In *Wellogix*, a software developer brought claims against a consulting firm for

---

[5]The Court has excluded Model #3 from evidence, but has considered the experience Williams gained from preparing three models with the AERMOD software solely for the purpose of determining whether he should be qualified as an expert.

misappropriation of trade secrets under Texas common law and theft of trade secrets under Texas Theft Liability Act.  On appeal, the defendant- appellant argued that the challenged expert's general computer sciences background did not qualify him to testify about the oil-and-gas industry, complex-services procurement, or SAP software.  The Fifth Circuit rejected the defendant-appellant's argument, finding that the expert "did not need particular expertise in the oil-and-gas industry, or complex services procurement, to help the jury understand software concepts and terms," and the expert "had 'specialized knowledge' about SAP's software because he . . . had been able to teach himself [SAP's programming language] . . . and implement the SAP software." *Id.* at 881-82 (citation and other internal quotation marks omitted).

In this case, even assuming that Williams' experience is comparable to a computer science degree, Plaintiffs are not offering Williams as an expert in computer software generally or as an expert in auto industry software.  Instead, Plaintiffs have offered him as an expert in air dispersion modeling, with which he has absolutely no experience until 2012 when he began using this software program.  He does not have **any** underlying experience in any field or area that provides him with an understanding greater than that of any lay person about air dispersion.  As proponents of his testimony, Plaintiffs have not met their burden of showing that this experience, knowledge, or skill somehow rendered him qualified to create an air dispersion model just because he used a software program.  *See Beauregard Parish Sch. Bd. V. Honeywell, Inc.*, No. 2:05-cv-1388, 2008 WL 821053 (W.D. La. Mar. 24, 2008) (Mechanical engineer was not qualified to offer testimony in the field of measurement and verification when he had not had course work or formal or informal training, had not performed the analysis himself, and used an outside firm because he not know how to operate

11

the system).[6]

To accept Plaintiffs' arguments, any person with significant computer software experience could qualify as an expert in air dispersion modeling. Even under the liberal approach to admission of expert testimony, Plaintiffs cannot prevail with this argument. The Court does not discount Williams' expertise, with or without a degree, in the undercar industry and perhaps in other areas. On the subject of air dispersion modeling, however, Williams is not qualified. Thus, the Court finds that IP's Motion in Limine should be GRANTED on this basis.

### B. Reliability and Relevance

Having determined that Williams is not qualified as an expert in air dispersion modeling, the Court need to not reach IP's remaining arguments. Nevertheless, the Court finds it appropriate to address one issue: Williams' use of permitted emissions for Models #1 and #2. Because the Court excluded Model #3 and Williams' affidavit, Plaintiffs can rely only on his report, opinions, and testimony relating to his use of the permitted emissions to prepare the air dispersion modeling study. The Court finds that Williams' reliance on the permitted emissions renders his opinion, testimony, and report both unreliable and irrelevant.

It is undisputed that the source emission output data Williams used for the first two models were merely projections made by IP of the maximum, permitted emissions it might make, but were not the amounts of chemicals or substances actually released into the air. In other words, Williams relied on the maximum emission levels allowed by its regulatory permits. Yet it is now undisputed that the actual emissions were lower than the permitted emissions. Based on this evidence, the Court finds that the source data used by Williams renders his methodology unreliable and his testimony

---

[6]Although Williams did use the software himself, he did so only with significant assistance from others, such as Drs. Clark and Tarr.

inadmissible.

Likewise, Williams' opinion, testimony, and report on permitted emissions is irrelevant. Plaintiffs cannot rely on the emissions that IP was permitted to make if those emissions were not actually made. Williams' testimony would not make any fact in evidence more probable or less probable, nor would it assist the jury in understanding the evidence or to determining a fact in issue.

### III. Conclusion

For the foregoing reasons, IP's Motion in Limine [Doc. No. 137] is GRANTED, and Williams is excluded from offering his report, opinions, or testimony at trial.

MONROE, LOUISIANA, this 25th day of September, 2014.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE